IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NONA ANTHONY, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) 02:12-cv-1341 |
| | ) |
| CAROLYN W. COLVIN,[1] | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER OF COURT**

September 18th, 2013

**I.   Introduction**

Nona Anthony ("Plaintiff") brought this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final determination of the Commissioner of Social Security ("Commissioner"), which denied her application for supplemental security income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381-1383(f).

**II.   Background**

**A.   Facts**

Plaintiff was born on May 20, 1955. (R. 146). She is a high school graduate, with past relevant work experience as a sales clerk (classified as semi-skilled, light-exertional work) and a daycare center worker (classified as semi-skilled, light-exertional work). (R. 17, 163, 180).

---

1.   Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 24(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Michael J. Astrue, as the Defendant in this suit. No further action needs be taken to continue this suit by reason of the last sentence of § 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Plaintiff alleges disability as of October 2, 2003, due to severe depression and poor concentration. (R. 146, 164). The record reflects that Plaintiff has not engaged in substantial gainful work activity since her alleged onset date.[2] (R. 11).

Plaintiff has a fairly limited record of treatment for her alleged impairments. On January 15, 2010, Plaintiff was taken to the ER after her daughter called 911 and reported that Plaintiff had chased her with a knife. (R. 205, 274). She was admitted for depression and homicidal ideation and remained hospitalized until January 21, 2010. (R. 207, 275). While hospitalized, Plaintiff's doctors placed her on Prozac and Trazadone. (R. 205). She also began therapy. (R. 205). On the date of Plaintiff's discharge, the attending physician, Umapathy Channamalappa, M.D., diagnosed her with adjustment disorder with depressed mood and mixed personality disorder traits. (R. 205). He indicated that she "improved within days of her admission and with the initiation of an antidepressant. Furthermore, the patient reported benefitting greatly from milieu therapy . . . ." (R. 205). He also reported in Plaintiff's discharge summary that she had a current Global Assessment of Functioning ("GAF") score of 68.[3] (R. 205).

Plaintiff began undergoing therapy with Milestone Center, Inc. ("Milestone") a week after her discharge. (R. 214). During her intake assessment, Plaintiff indicated that she was unemployed but looking for work. (R. 214-15). She reported that she felt increased stress because of recent financial struggles and her living situation (her two adult children lived with

---

2. Plaintiff's decision to stop working at the daycare center in 2003 was entirely unrelated to any alleged disability. (R. 243). She left because of "administrative concerns," namely, she was apparently not getting paid in a timely manner. (R. 243).
3. A patient's GAF score measures, on a scale of 0-100, the overall effect of her mental health disorder on her ability to function in activities of daily living, as well as socially and occupationally. *See Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition-Revised* 34 (4th ed. Text Revision, Am. Psych. Ass'n 2000). A GAF of 41 to 50 is indicative of serious impairment in social, occupational, or school functioning, while a GAF of 61 through 70 suggests mild symptoms or some difficulty in functioning. *Id.*

her).  (R. 228).  Plaintiff's mental status assessment was normal, though she did report feeling anxious and depressed and displayed poor insight.  (R. 222-25).  She was diagnosed with major depressive disorder (single episode, moderate) and was assessed a GAF score of 45.  (R. 227).

On February 26, 2010, Plaintiff underwent a psychiatric examination with Ahmed Jahangeer, M.D. (R. 233-36).  In his notes, Dr. Jahangeer indicated that Plaintiff "present[ed] with depression, anxiety and increasing stressors, primarily financial stress . . . she is reporting very dysphoric mood, not coping with her life issues." (R. 233).  She also explained that her problems at home continued but that she was planning to move into a new apartment with the help of public assistance.  (R. 233).  Her mental status assessment was unremarkable.  (R. 233-34).  Although she reported feeling anger and irritability, she stated that Prozac helped to control her anger, cry less, and feel less anxious.  (R. 235).  She also reported sleeping much better.  (R. 235).

Plaintiff had her first session with Allison Walker, then a non-licensed therapist, on March 12, 2010.  (R. 319).  At the time, Ms. Walker reported that Plaintiff's basement had recently flooded and her "main concern" was looking for a new apartment.  (R. 320).  According to Ms. Walker's notes, Plaintiff was "coping well" with this situation.  (R. 320).

Plaintiff returned to Ms. Walker's office on March 31, 2010.  (R. 321).  Her mental status examination was again unremarkable.  (R. 321).  By her April 9, 2010, visit with Ms. Walker, Plaintiff was apparently feeling somewhat better, but she explained that she still felt overwhelmed because of her living situation and financial difficulties.  (R. 323).

Plaintiff followed up with Dr. Jahangeer that same day and reported that her mood was "OK."  (R. 308).  She did not have thoughts of self harm, aggression, or violence.  (R. 308).  She also denied experiencing hallucinations, perceptual disturbances, paranoia, or delusions, and

displayed "no psychotic symptoms." (R. 208). Dr. Jahangeer noted that Plaintiff continued to experience financial stress and loneliness, but that, overall, she had been feeling "a little better." (R. 308). Specifically, he indicated that she was not as depressed or anxious as before, but still experienced dysphoria. (R. 308). Dr. Jahangeer also noted that Plaintiff's medications were helpful and that she was sleeping better. (R. 309).

On June 7, 2010, Plaintiff returned to Dr. Jahangeer's office for another follow-up. (R. 238). Dr. Jahangeer noted that Plaintiff's progress was "mild/moderate." (R. 238). She still complained of financial difficulties, which left her feeling "helpless" and without a social life. (R. 239). Nonetheless, she reported that she was getting more sleep and also found her Prozac to be helpful. (R. 239). According to Dr. Jahangeer, Plaintiff "explain[ed] that her mood is not as depressed" but she still felt stressed out over her finances. (R. 239). She reported no other medical problems, and Dr. Jahangeer decided to continue on her current regimen of medications, from which she was benefitting. (R. 239).

Plaintiff's next session with Ms. Walker was on June 16, 2010. (R. 326). Ms. Walker's notes reflect that Plaintiff had recently paid a deposit on a new apartment and felt "very excited" about it. (R. 326). Ms. Walker also noted that Plaintiff looked more relaxed. (R. 326). As Ms. Walker explained, "[Plaintiff's living situation] has been her main stress for many months and [she] is relieved to have it come to an end. She is happy to come in to therapy." (R. 326).

On August 3, 2010, Scott Kaper, Ph.D., conducted a clinical psychological disability evaluation of Plaintiff. (R. 241). Dr. Kaper noted that Plaintiff reported experiencing "low mood, ruminating guilt, some trouble falling asleep (5 to 6 hours total sleep at night), fairly significant anhedonia, agitation, some low energy, poor appetite, some trouble thinking, and low self-esteem." (R. 242). He further noted that Plaintiff had "fleeting suicidal ideation" and

4

"worrie[d] a lot" over her financial issues. (R. 242). Notably, Dr. Kaper also remarked that she had "a very limited psychiatric history," which was limited to her January 10, 2010, hospitalization and her weekly sessions at Milestone. (R. 243). He opined that "[d]ifficulties with her children, perhaps her aging, and increasing problems with her finances may have combined to bring down her mood," thereby resulting in the January 2010 episode with her daughter. (R. 244).

Upon examination, Plaintiff displayed "no gross disturbances in thought or perception." (R. 243). Dr. Kaper indicated that her conversation was productive and her insight/judgment were variable. (R. 243Furthermore, she had difficulties maintaining her attention, which Dr. Kaper attributed to her anxiety and depression. (R. 244). Dr. Kaper diagnosed Plaintiff with major depressive disorder (single episode, moderate) and generalized anxiety disorder (mild, within this episode of depression) and assessed a current GAF of 55. (R. 244). He believed Plaintiff had "slight" restrictions in her ability to understand, remember, and carry out short, simple instructions, and "moderate" restrictions in her ability to understand, remember, and carry out detailed instructions and make work-related judgments. (R. 246). He also believed that Plaintiff had "moderate" restrictions in her ability to interact appropriately with the public, supervisors, co-workers; respond appropriately to work pressures in a usual work setting; and respond appropriately to changes in a routine work setting. (R. 246). At the conclusion of his evaluation, Dr. Kaper indicated that Plaintiff's "prognosis is fair to good depending on the extent to which she maintains engagement in psychiatric services." (R. 245).

Arlene Rattan, Ph.D., a state agency psychologist, completed a mental RFC assessment relative to Plaintiff's claim on August 11, 2010. (R. 248-63). In her opinion, Plaintiff was at most "moderately limited" in her ability to perform the various work-related activities described

in the evaluation form.  (R. 248-50).  Dr. Rattan opined that although Plaintiff's ability to understand complex or detailed instructions was limited, she could nonetheless understand and remember simple instructions; perform simple, routine, repetitive work in a stable environment; make simple decisions; ask simple questions and accept instructions; and sustain an ordinary routine without special supervision.  (R. 250).

On August 30, 2010, Plaintiff followed up with Dr. Jahangeer.  (R. 314).  She reported that her mood was "a little better" and her anxiety had decreased, but she still felt depressed.  (R. 314).  Dr. Jahangeer noted that she was taking better care of herself.  (R. 315).  Her mental health assessment was unremarkable.  (R. 314).  On the other hand, Dr. Jahangeer's notes indicate that Plaintiff continued to complain of stress related to her financial difficulties.  (R. 315).  Additionally, because she was still having some trouble sleeping, Dr. Jahangeer increased her dose of Trazodone and asked her to follow up in two months.  (R. 315).

That same day, Plaintiff had a therapy session with Ms. Walker, who noted that Plaintiff continued to worry about her finances.  (R. 331).  Plaintiff reportedly continued to feel "down" but her mental state had improved since her hospitalization.  (R. 331).  Plaintiff indicated that the therapy session was helpful.  (R. 331).

Ms. Walker completed two check-box questionnaires regarding Plaintiff's ability to work on September 20, 2010.  (R. 10).  Ms. Walker opined that Plaintiff had: fair ability to follow rules, use judgment, and function independently; poor ability to related to co-workers, deal with the public, interact with supervisors, and understand, remember and carry out simple job instructions; and no ability to deal with work stress; maintain attention/concentration; or understand, remember and carry out complex or not complex instructions.  (R. 337).  Ms. Walker

assessed a current GAF of 45, and a highest GAF in the past year of 65. (R. 339). In her view, Plaintiff could not work a normal workday or workweek. (R. 339).

Nevertheless, Plaintiff continued to show improvement at her next session with Ms. Walker on September 24, 2010. (R. 335). She told Ms. Walker that she felt "things [were] working out" because she had recently been approved for food stamps and was reapplying for cash and medical assistance. (R. 335). She also reported that her symptoms of depression had started to lessen as her financial worries subsided. (R. 335). As a result, Plaintiff was happy with her progress to date. (R. 335).

At a November 22, 2010, appointment with Plaintiff, Dr. Jahangeer noted similar improvements. (R. 345). He indicated in his notes that Plaintiff felt less stress and less overwhelmed than before and that her coping ability and sleep had improved. (R. 346). Plaintiff again saw Dr. Jahangeer on February 11, 2011 – the last visit about which medical records are available – and reported she was doing "OK." (R. 341). She had recently stopped taking her medications because they made her nauseous. (R. 342). As a result, she felt that she was having difficulty concentrating and was nervous and anxious. (R. 342). She did not, however, report feeling depressed. (R. 342). In fact, she told Dr. Jahangeer that "Prozac has helped her so much with her mood and she is in very good spirits." (R. 342).

B. **Procedural History**

Plaintiff protectively filed an application for SSI on December 11, 2008, in which she claimed total disability beginning October 2, 2003. An administrative hearing was held on April 11, 2011, before Administrative Law Judge Leslie Perry-Dowdell ("ALJ"). (R. 9, 23). Plaintiff was represented by an attorney, Amanda Bonnesson, and testified at the hearing. (R. 23). Tania Shullo, an impartial vocational expert ("VE"), also testified at the hearing. (R. 9, 23).

On May 24, 2011, the ALJ rendered an unfavorable decision to Plaintiff. (R. 11). Although the ALJ found that Plaintiff had two severe impairments (depression and anxiety), she went on to conclude that those impairments did not meet or equal one of the listed impairments as defined in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (R. 11).  The ALJ further found that Plaintiff retained the ability to perform a full range of work at all exertional levels, subject to several limitations: she is limited to performing "simple, routine competitive tasks but the work needs to be isolated from the public with only occasional supervision and occasional interaction with coworkers." (R. 13).  While Plaintiff did not have the residual functional capacity ("RFC") to return to her past relevant work, she retained the ability to perform a significant number of jobs existing in the national economy and therefore was not "disabled." (R. 17–18). The ALJ's decision became the final decision of the Commissioner on August 30, 2012, when the Appeals Council denied Plaintiff's request to review the decision of the ALJ.

On September 26, 2012, Plaintiff filed her Complaint in this Court, seeking judicial review of the decision of the ALJ.  (ECF. No. 4).  The parties have filed cross-motions for summary judgment.  (ECF. Nos. 11, 14).   The factual record has been fully developed at the administrative level.  (ECF. No. 8).  Therefore, the motions are ripe for disposition.  For the reasons that follow, the Court will grant the Commissioner's motion and deny Plaintiff's motion.

**III.**     **Legal Analysis**

    **A.**     **Standard of Review**

The Act limits judicial review of disability claims to the Commissioner's final decision. 42 U.S.C. § 405(g).  If the Commissioner's finding is supported by substantial evidence, it is conclusive and must be affirmed.  42 U.S.C. § 405(g); *see Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005).  The Supreme Court has defined "substantial evidence" as "such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks omitted). It consists of more than a scintilla of evidence but less than a preponderance. *Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 798, 800 (3d Cir. 2010).

When resolving the issue of whether an adult claimant is or is not disabled, the Commissioner utilizes a five-step sequential evaluation. 20 C.F.R. §§ 404.1520 and 416.920. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to his or her past relevant work, and (5) if not, whether he or she can perform other work. *See* 42 U.S.C . § 404.1520; *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 545-46 (3d Cir. 2003) (quoting *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118-19 (3d Cir. 2000)).

To qualify for disability benefits under the Act, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him or her from engaging in any substantial gainful activity for a statutory twelve-month period." *Fargnoli v. Massanari*, 247 F.3d 34, 38-39 (3d Cir. 2001) (internal quotation marks omitted); 42 U.S.C. § 423 (d)(1).

This may be done in two ways: (1) by introducing medical evidence that the claimant is disabled per se because he or she suffers from one or more of a number of serious impairments delineated in 20 C.F.R. Regulations No. 4, Subpt. P, Appendix 1, *see Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004); or (2) in the event that claimant suffers from a less severe impairment, by demonstrating that he or she is nevertheless unable to engage in "any other kind of substantial gainful work which exists in the national economy . . . ." *Campbell*, 461 U.S. at 461 (citing 42 U.S.C. § 423 (d)(2)(A)).

In order to prove disability under the second method, a claimant must first demonstrate the existence of a medically determinable disability that precludes him or her from returning to his or her former job. *See Newell*, 347 F.3d at 545-46; *Jones*, 364 F.3d at 503. Once it is shown that claimant is unable to resume his or her previous employment, the burden shifts to the Commissioner to prove that, given the claimant's mental or physical limitations, age, education and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Rutherford*, 399 F.3d at 551; *Newell*, 347 F.3d at 546; *Jones*, 364 F.3d at 503; *Burns v. Barnhart*, 312 F.3d 113, 119 (3d Cir. 2002).

Where a claimant has multiple impairments that may not individually reach the level of severity necessary to qualify a single impairment for Listed Impairment status, the Commissioner nevertheless must consider all of the impairments in combination to determine whether, collectively, they meet or equal the severity of a Listed Impairment. *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 502 (3d Cir. 2010); *see also* 42 U.S.C. § 423(d)(2)(C) (providing that "in determining an individual's eligibility for benefits, the Secretary shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity").

**B.     Discussion**

As set forth in the Act and applicable case law, the Court may not undertake a de novo review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986), *cert. denied*, 482 U.S. 905 (1987). Instead, the Court must simply review the findings and conclusions of the ALJ to determine whether they are supported by substantial evidence. 42 U.S.C. § 405(g); *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999).

In her motion for summary judgment, Plaintiff claims that the ALJ committed two (2) errors. First, she contends that the ALJ erred in giving limited weight to Ms. Walker's opinion as to Plaintiff's inability to engage in work-related activities. Pl.'s Br. in Supp. of Mot. for Summ. J. at 4-5 (ECF No. 12). Second, she argues that the ALJ's RFC finding and, in turn, the hypothetical she posed to the VE, was "too vague" and thus the VE's testimony did not constitute substantial evidence. *Id.* at 5-6. The Commissioner, for her part, argues that the ALJ properly weighed all of the medical evidence of record, including Ms. Walker's opinion, and is therefore supported by substantial evidence. Def.'s Br. in Supp. of Mot. for Summ. J. at 12-19 (ECF No. 15). The Court will address Plaintiff's claims *seriatim*.

    1.    *The ALJ Did Not Err in Rejecting the Opinion of Plaintiff's Treating Therapist.*

Plaintiff first argues that the ALJ failed to properly weigh the opinion of her treating therapist, Ms. Walker, set forth in the check-box forms completed on September 20, 2010. Pl.'s Br. in Supp. of Mot. for Summ. J. at 4 (ECF No. 12). In her decision, the ALJ considered the questionnaires completed by Ms. Walker, in which she opined that Plaintiff had a number of severe work-related restrictions. (R. 16). The ALJ found, however, that the evidence of record did not support Ms. Walker's opinion, and thus, she discounted it. (R. 16). The Court finds that the ALJ's treatment of Ms. Walker's opinion was proper.

It is well settled that an ALJ must accord a treating source's opinions "great weight, especially when [they] reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Plummer v. Apfel*, 186 F.3d at 422, 429 (3d Cir. 1999) (quoting *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir. 1987). However, "[o]nly 'acceptable medical sources' can be considered treating sources whose opinions may be entitled to controlling weight." *Lehman v. Astrue*, No. 09–1449, 2010 WL 2034767, at *11 (W.D. Pa.

May 18, 2010) (citing Social Security Ruling ("SSR") 06-03P, 2006 WL 2329939 (S.S.A. Aug. 9, 2006)). A therapist is not an "acceptable medical source." *See* 20 CFR §§ 404.1513(d), 416.913(d). Therefore, Ms. Walker's opinion as to Plaintiff's abilities or lack thereof was not entitled to controlling weight.

That is not to say that Ms. Walker's opinion was not entitled to any consideration by the ALJ. *See* SSR 06-03P, 2006 WL 2329939. The Social Security Administration ("SSA") has explained that while evidence from "medical sources, who are not technically deemed 'acceptable medical sources'" may not be controlling, it is nonetheless "important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id.* at *3. In evaluating evidence from medical sources such as Ms. Walker, the ALJ must consider the following factors:

- how long the source has known and how frequently the source has seen the individual;

- how consistent the opinion is with other evidence;

- how well the source explains the opinion;

- whether the source has a specialty or area of expertise related to the individual's impairment(s); and

- any other factors that tend to support or refute the opinion.

*Id.* at *4-5 (citing 20 C.F.R. § 404.1527(d)).

In this case, the ALJ properly applied those factors in deciding that Ms. Walker's opinion was entitled to "minimal weight." (R. 16). As the ALJ concluded, there was simply no objective basis for Ms. Walker's opinion as to the debilitating effects of Plaintiff's depression and anxiety. (R. 16). Plaintiff had no history of medical or mental health issues prior to the incident in January 2010, and thereafter, it appears from the record that her conditions, though undoubtedly

serious for her, stemmed primarily from her financial struggles and housing situation. Notably, aside from her hospitalization in January 2010, Plaintiff never required serious medical attention. All of her mental status assessments during her visits with Dr. Jahangeer were unremarkable, and though she did at times display difficulty paying attention, the ALJ incorporated those restrictions into her RFC assessment by limiting Plaintiff to simple, routine, repetitive tasks. (R.13). Furthermore, notes from her visits with Dr. Jahangeer reflect that her condition had steadily improved on account of her therapy sessions and her medication.

Ms. Walker's progress notes reflect a similar pattern of progress. In fact, in the therapy session immediately preceding Ms. Walker's completion of the questionnaire, she noted that Plaintiff had shown improvement since her hospitalization and reacted positively to therapy. (R. 331). Likewise, during a session just four (4) days after the date on which the questionnaire was completed, Ms. Walker noted that Plaintiff felt things were "working out" in part because her housing woes had subsided and her financial situation had improved. (R. 335). Such statements belie Ms. Walker's opinion as to the work-preclusive effects of Plaintiff's conditions. Additionally, because Ms. Walker offered her opinion in a check-box form, without providing any substantiation for her views, the ALJ had even more reason to discount it. *See Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993) (explaining that "[f]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best").

Assuming, *arguendo*, that Ms. Walker's opinion was entitled to greater weight, contrary to Plaintiff's suggestion, it would not have been sufficient to establish disability. *See* Pl.'s Br. in Supp. of Mot for Summ. J. at 4 ("This is an important error, because if the opinion were given greater weight, disability may be established."). Plaintiff would have still needed "evidence from an 'acceptable medical source' for this purpose." SSR 06-03P, 2006 WL 2329939, at *2.

However, the record does not contain any such evidence. To the contrary, Plaintiff's psychiatrist, Dr. Jahangeer, noted continued improvements in Plaintiff's condition over the course of her treatment. Dr. Jahangeer's records were consistent with the reports of both Dr. Kaper, the agency consultant who noted that Plaintiff's prognosis was good, and Dr. Rattan, the state psychologist who opined that Plaintiff retained the RFC to perform simple, routine, repetitive work in a stable environment. Thus, even if the ALJ erred in her treatment of Ms. Walker's opinion, the error would have been harmless because the record does not otherwise support a finding of disability.

> 2. *The ALJ Did Not Err in Her RFC Finding or the Hypothetical She Posed to the VE.*

Plaintiff also objects to the ALJ's RFC assessment and the hypothetical question she posed to the VE, arguing that they were impermissibly vague. Pl.'s Br. in Supp. of Mot. for Summ. J. at 5-6 (ECF No. 12). The Court cannot agree.

The ALJ expressly considered all of the evidence of record that related to Plaintiff's limitations in social functioning, including Plaintiff's own testimony, and took it into account in making her RFC assessment. (R. 13-14). For example, Dr. Kaper opined that Plaintiff's ability to respond appropriately to supervision, co-workers, and works pressures in a work setting was impacted by her depression and anxiety. (R. 246). Specifically, Dr. Kaper found that because of her impairments, Plaintiff had "moderate" restrictions in her ability to interact appropriately with the public, supervisors, co-workers; respond appropriately to work pressures in a usual work setting; and respond appropriately to changes in a routine work setting. (R. 246). Dr. Rattan found that Plaintiff had moderate limitations in those same areas. (R. 249). Similarly, Plaintiff testified that she does not participate in many activities outside of her home and is not involved in social groups. (R. 14). She further testified that does not like being around crowds because

they cause her anxiety. (R. 14). Both Plaintiff's psychiatrist, Dr. Jahangeer, and her therapist, Ms. Walker, indicated that Plaintiff's coping abilities had improved on account of her medications. (R. 14-15). Nevertheless, the ALJ's RFC finding reflected the social functioning limitations described by Dr. Kaper and Plaintiff, restricting her to "isolated contact" and "occasional supervision and interaction." (R. 13).

Plaintiff's suggestion that the ALJ should have "pinned it down in terms of percentages," rather than using the phrases "isolated" and "occasional" when describing Plaintiff's restrictions is baseless. The Court recognizes that a hypothetical question posed to a VE must incorporate all of a claimant's impairments that are supported by the record with "great specificity." *Burns v. Barnhart*, 312 F.3d 113, 122-23 (3d Cir. 2002) (quoting *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987)). However, "[i]n Social Security disability cases, 'occasional' is a term of art meaning 'occurring from very little up to one-third' of the workday." *Singleton v. Astrue*, No. 5:09CV182-J, 2009 WL 2106142, at *5 (W.D. Ky. July 15, 2009) (quoting SSR 83-10). When read in conjunction with the SSA's definition of "occasional," the ALJ's RFC assessment limited Plaintiff to interaction with co-workers and supervisors for no more than one-third of the workday. This assessment properly accounted for all of moderate limitations in Plaintiff's ability to interact appropriately with the co-workers and supervisors described by Drs. Kaper and Rattan, and Plaintiff's own testimony regarding her capabilities. *See Singleton*, 2009 WL 2106142, at *5 (concluding that the ALJ logically accommodated a psychologist's assessment that "the plaintiff is 'satisfactorily' able to interact appropriately" in a work setting by restricting her to interaction with the public, co-workers, and supervisors "for no more than one-third of the workday"). The ALJ was not required to be any more specific, as our appellate court has routinely upheld RFC assessments incorporating the exact same or similar language. *See, e.g.*,

*Diaz v. Comm'r of Soc. Sec.*, 440 Fed. Appx. 70, 72 (3d Cir. 2011) (concluding that RFC assessment that limited plaintiff's "work to simple jobs involving occasional contact with supervisors, coworkers, and the public" was adequate); *Boniella v. Comm'r of Soc. Sec.*, 390 Fed. Appx. 122, 124-25 (3d Cir. 2010) (holding that RFC assessment that limited plaintiff to no "more than occasional contact with coworkers or supervisors" was consistent with the evidence). Accordingly, the Court finds that the ALJ did not err in making her RFC assessment or in crafting the hypothetical question she posed to the VE.

### IV.    Conclusion

It is undeniable that Plaintiff has a number of impairments, and this Court is sympathetic and aware of the challenges that she faces in seeking gainful employment. Under the applicable standards of review and the current state of the record, however, the Court must defer to the reasonable findings of the ALJ and his conclusion that Plaintiff is not disabled within the meaning of the Act, and that she is able to perform a full range of work at all exertional levels.

For these reasons, the Court will grant the Motion for Summary Judgment filed by the Commissioner and deny the Motion for Summary Judgment filed by Plaintiff.

An appropriate Order follows.


                                                                McVerry, J

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NONA ANTHONY, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | 02:12-cv-1341 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER OF COURT

**AND NOW**, this 18th day of September 2013, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED**, **ADJUDGED, AND DECREED** that:

1. The Motion for Summary Judgment (ECF No. 14) filed by Carolyn W. Colvin, Acting Commissioner of Social Security is **GRANTED**;

2. The Motion for Summary Judgment (ECF No. 11) filed by Plaintiff, Nona Anthony, is **DENIED**; and

3. The Clerk will docket this case closed.

BY THE COURT:

s/Terrence F. McVerry
United States District Court Judge

cc: **Cynthia Berger, Esquire**
Email: cberger@bergerandgreen.com
**Robert W. Gillikin, II, Esquire**
Email: rgillikin@ruttermills.com
**Albert Schollaert, Esquire**
Email: albert.schollaert@usdoj.gov